**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Walter Lee CHAMBERS, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James Isaac JOHNSON, Defendant–Appellant.**

Nos. 91–5190, 91–5191.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1992.

Decided Feb. 5, 1993.

**1265**

Daniel J. Clifton, Charlotte, NC, argued, for defendant-appellant Johnson.

Dale Stuart Morrison, Charlotte, NC, argued, for defendant-appellant Chambers.

Frank DeArmon Whitney, Asst. U.S. Atty., Charlotte, NC, argued (Thomas J. Ashcraft, U.S. Atty., Gretchen C.F. Shappert, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before WIDENER, MURNAGHAN, and WILLIAMS, Circuit Judges.

## OPINION

WILLIAMS, Circuit Judge:

Walter Lee Chambers and James Isaac Johnson appeal their jury convictions and sentences for: (1) conspiracy to possess with intent to distribute in excess of five kilograms of cocaine, 21 U.S.C. § 846 (1988); (2) conducting an illegal gambling business, 18 U.S.C. § 1955 (1988); and (3) conspiracy to commit an offense against the United States (i.e., to conduct an illegal gambling business), 18 U.S.C. § 371 (1988). Chambers contends that the district court erred in concluding that he was a manager or supervisor and increasing his offense level under § 3B1.1(b) of the Sentencing Guidelines. United States Sentencing Commission, *Guidelines Manual* (Nov. 1991). Chambers urges the evidence did not support finding that he was a manager or supervisor because it did not show that he supervised any people. Chambers also contends that the district court clearly erred in finding that the drug conspiracy involved at least fifteen kilograms of cocaine. In addition, both Defendants challenge the sufficiency of evidence supporting their

convictions and the failure of the district court to admit as exculpatory evidence the results of a witness's polygraph examination.

Although we conclude the evidence did not show that Chambers supervised people, we also conclude that supervision of people is not necessary to be a manager under § 3B1.1(b). Because the district court did not make any factual findings based upon Chambers's role as a manager, we vacate Chambers's sentence and remand for further fact-finding and resentencing. In all other respects, we affirm the judgments of the district court.

### I

Chambers and Johnson were among twenty-three persons indicted for conducting and conspiring to conduct an illegal gambling business and were among fifteen persons indicted for conspiracy to distribute cocaine.

The cocaine conspiracy involved five cocaine houses including the "Big House," the "Yellow House," the "Blue Light," and "Cozy's." The evidence presented at trial focused primarily on Cozy's. Cozy's was the quintessential drug house. Steel bars shielded the doors and windows. Upon entering Cozy's a buyer came upon a second door with a mail slot that shielded a separate interior room. Behind the mail slot in this separate room, a coconspirator would "work the trap," i.e., exchange the buyer's cash for cocaine. The second door and interior room created a barrier for law enforcement officers to penetrate before they could actually seize the cocaine. Each morning a coconspirator would light a fire in the fireplace to destroy cocaine in case of a police search, regardless of the season or the temperature outside.

The gambling conspiracy involved an illegal numbers lottery. Bets were accepted at various locations. "Runners" or "bagmen" would take the bettors' tickets to a drop off point. The tickets were then transferred to a "bank" or "tally house" where the winning bets were determined. The location of the bank was frequently changed to avoid detection. After the win-

ning tickets had been identified, the tickets would be put in storage for three or four days in case a winning ticket had been overlooked.

Following indictment, most of the coconspirators pled guilty pursuant to plea agreements. Chambers and Johnson chose to go to trial, and the testimony of their numerous coconspirators featured prominently in the case against them. The jury convicted them on all counts. Chambers was sentenced to 210 months imprisonment based upon a total offense level of 37. The sentence included a three level upward adjustment pursuant to § 3B1.1(b) of the Sentencing Guidelines for being a manager or supervisor. Johnson was sentenced to 121 months imprisonment based upon a total offense level of 32. Both Defendants appealed.

## II

Chambers contends that the district court erred in finding that he was a manager or supervisor and increasing his offense level under § 3B1.1(b) of the Sentencing Guidelines.[1] He urges that the evidence does not support a finding that he supervised people, and therefore does not support a § 3B1.1(b) adjustment. We agree that the evidence does not support finding supervision of people; however, we conclude that under some circumstances a defendant's offense level may be increased under § 3B1.1(b) even though the defendant did not supervise anyone. Nevertheless, because the district court's factual findings were insufficient, we remand for further fact-finding and resentencing.

## A

Section 3B1.1 "provides a range of adjustments to increase [a defendant's] offense level based upon the size of a crimi-

nal organization ... and the degree to which the defendant was responsible for committing the offense." U.S.S.G. § 3B1.1, comment. (backg'd). Application of the guideline involves two separate factual inquiries. First, the district court must determine the size or scope of the criminal organization. If the criminal activity involved five or more participants "or was otherwise extensive," then either § 3B1.1(a) or (b) may apply. Otherwise, § 3B1.1(c) may apply. Second, the district court must evaluate the defendant's role in the offense. If the defendant was an organizer, leader, manager, or supervisor, then the defendant's offense level should be increased. With smaller criminal organizations, the increase in the defendant's offense level is the same for each of these four roles. *Id.* § 3B1.1(c) (two level increase). With larger organizations (i.e., those with five or more participants), the offense level is increased more for organizers and leaders, *id.* § 3B1.1(a) (four level increase), than for managers and supervisors, *id.* § 3B1.1(b) (three level increase).

Chambers does not dispute the district court's determination that the conspiracy involved five or more participants, nor does the Government contend that he was an organizer or leader. The dispute is over whether he was a manager or supervisor.

Although the Government asked the district court to increase Chambers's base offense level based on his role as a manager, the district court's only factual finding was that Chambers "was a supervisor at some level." The district court thus treated terms "manager" and "supervisor" as synonymous. We shall treat the district court's finding as one that Chambers was a manager, as argued by the Government at sentencing, and therefore we do not ad-

1. Section 3B1.1 provides that:
   Based on the defendant's role in the offense, increase the offense level as follows:
   (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
   (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the

   criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
   (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

dress whether there is a distinction between the two terms as used in § 3B1.1.

### B

■ We agree with Chambers that the evidence does not support a finding that he supervised people. Chambers's coconspirators testified at trial about his role in the conspiracy. They were consistent in their portrayal of what he did. They testified that Chambers was one of three or four individuals who would bring cocaine to Cozy's when the house ran low on stock, pick up the cash on hand, and take the cash away. In addition, James Edward "Ned" Johnson, the "kingpin" of the cocaine conspiracy, testified that he and Chambers were responsible for going to the stashhouse, packaging the cocaine for resale, and transferring the packaged cocaine to Cozy's. Only Chambers, Ned Johnson, and Pee Wee Givens knew the location of the stashhouse.[2]

Although the witnesses testified that Ned Johnson hired and paid them, no one testified that Chambers performed a single supervisory task. Indeed, of the ten witnesses involved in the cocaine conspiracy, none testified that Chambers supervised anyone. Moreover, the basis for a § 3B1.1(b) adjustment given in the presentence report was Chambers's "high ranking position within the conspiracy" and his privileged knowledge of the location of the stashhouse. (J.A. 741.) The presentence report does not indicate that Chambers supervised any of his coconspirators. In short, the evidence does not support finding that Chambers supervised people.

### C

■ Chambers argues that a defendant who did not supervise people cannot be considered a manager or supervisor within the meaning of § 3B1.1(b). We disagree. In *United States v. Paz*, 927 F.2d 176 (4th Cir.1991), we affirmed a defendant's sentence based upon his management of property. In *Paz*, the defendant argued that

the evidence showed he was a courier, not a manager. We disagreed:

> [E]vidence indicated that Paz controlled the money, drug products and residences where the drug trafficking was performed. From this evidence, the district court concluded that Paz was a manager of the enterprise. We are not persuaded that this factual determination was clearly erroneous.

*Id.* at 180; *see also United States v. Johnson*, 906 F.2d 1285, 1291–92 (8th Cir.1990) ("A finding that a defendant is functioning as an organizer or leader, however, does not necessarily mean that he is directly controlling other individuals."); *United States v. Mares–Molina*, 913 F.2d 770, 776 (9th Cir.1990) (Rymer, J., dissenting) (plain meaning of "manager" includes management of property).

Other circuits have disagreed with our holding in *Paz*. *See United States v. Fuentes*, 954 F.2d 151, 154 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992); *United States v. Mares–Molina*, 913 F.2d 770, 773–74 (9th Cir.1990); *United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991); *United States v. Fuller*, 897 F.2d 1217, 1220–21 (1st Cir.1990). They make two arguments in favor of requiring supervision of people: (1) the term "manager" implicitly requires supervision of people; and (2) management of property is an insufficient basis for determining relative culpability. We respectfully disagree with both conclusions.

To determine the meaning of the term "manager" we apply principles of statutory construction. Statutory interpretation begins with the language of the statute itself. *Ardestani v. I.N.S.*, —— U.S. ——, ——, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991). Except in "rare and exceptional circumstances," statutory language is given its plain meaning as expressed by the ordinary meaning of the words used. *Id.* at ——, 112 S.Ct. at 520.

---

**2.** "Pee Wee" Givens was Ned Johnson's "business" partner. Givens died prior to Defendants' indictment.

The Guidelines do not define the term "manager." Application note 3 to § 3B1.1 does provide a list of factors to be considered in distinguishing between the roles of leader, organizer, manager, and supervisor. Although the "degree of control and authority exercised over others" is one factor, the application note pointedly does not make this factor a requirement for any of these roles. If a requirement for supervision of people can be found, it must derive from the term "manager" itself. Because the Guidelines do not define the term "manager," we turn to its dictionary definition.

*Webster*'s defines "manager" as "a person whose work or profession is the management of a specified *thing* (as a business, an institution, or a particular phase or activity within a business or institution)." *Webster's Third New International Dictionary* 1372 (1986) (emphasis added). In a similar vein, *Random House* defines "manager" as "a person who has control or direction of an institution, business, etc., or of a part, division or phase of it," *The Random House Dictionary of the English Language* 1166–67 (2d ed. 1987), and *Oxford* defines "manager" as "[o]ne whose office it is to manage a business establishment or a public institution." 6 *The Oxford English Dictionary* 106 (1933). Supervision of people is required by none of these definitions. Whether management requires supervision of people depends upon what is being managed. A manager of a department within a labor-intensive business supervises people; a manager of a small apartment building or of investments does not. Accordingly, construing the term "manager" in accord with its plain meaning, we hold that one who manages property without supervising people can be a "manager" within the meaning of § 3B1.1(b).

Properly applied, this interpretation is consistent with the primary goal of § 3B1.1, namely, the determination of a defendant's culpability relative to other participants in a criminal activity "based upon the role the defendant played in committing the offense." U.S.S.G. ch. 3, pt. B, intro. comment. We are mindful of the concern that management of property may not be as sound a basis for determining relative culpability as supervision of people. As one court has noted, "[t]he lowliest participant in a criminal enterprise can ordinarily be said to manage, in the broad sense of that word, some segment or property of the enterprise." *Fuentes*, 954 F.2d at 153–54.

This concern does not, however, require a narrow construction of the term "manager." Rather, the solution lies in focusing on the factors identified in the Sentencing Guidelines for distinguishing between leaders, organizers, managers, supervisors, and other participants in a criminal activity. These factors include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.3). Of these seven factors, only one, the "degree of control and authority exercised over others," relates to supervision of people.

■ Under these factors, neither mere possession of property nor mere service as a courier supports increasing a defendant's offense level as a manager. In at least some cases, however, application of these factors to the evidence may show that, although a defendant did not supervise people, his extensive management responsibilities over property, assets, or activities of the criminal organization justifies increasing his offense level pursuant to § 3B1.1(b). For example, the person masterminding the money laundering component of a large drug conspiracy may exercise considerable decision making authority, may lay claim to a large share in the proceeds of the crime, and may be a central participant in the criminal activity without ever supervising anybody. His role may be less significant than that of the leader or organizer, but of equivalent culpability

with that of the supervisor of a drug house staff. Thus, an increase in offense level under § 3B1.1(b) based on a defendant's role as a manager is justified where application of these factors indicates that the defendant's role in the offense was greater than that of less responsible participants.

### D

■ The district court's factual findings supporting the upward adjustment in Chambers's sentence were limited to a statement that Chambers "was at least a supervisor at some level." We find no basis in the record for concluding that the district court considered the factors outlined in application note 3 in making this finding. The evidence may or may not support the conclusion that Chambers was a manager or supervisor. However, without specific factual findings showing that the district court evaluated the defendant's role in the offense in light of the factors in application note 3, we cannot conduct meaningful appellate review of this issue. Accordingly, we vacate Chambers's sentence and remand.[3]

On remand, the district court should apply the factors outlined in application note 3 and determine whether Chambers's role in the conspiracy was sufficiently extensive to warrant an increase in offense level under § 3B1.1(b). *See United States v. Brooks*, 957 F.2d 1138, 1150 (4th Cir.) (adjustment not supported by evidence relied on by district court, but other evidence could support it on remand), *cert. denied*, ── U.S. ──, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992). If an increase is warranted, then the district court should identify which factors in application note 3 justify its decision.

### III

■ Chambers also challenges the district court's finding that the conspiracy involved at least fifteen kilograms of cocaine.

We review this finding for clear error. 18 U.S.C. § 3742(e).

The evidence showing how much cocaine was distributed consisted of estimates by various witnesses of the amount of cash taken in during a shift at Cozy's. Sylvester Springs, for example, testified that during 1987 the average weekly intake of cash was around $40,000 to $45,000. He further testified that from the middle of 1988 through 1989 the average weekly intake was around $60,000. Ned Johnson testified that Cozy's operated for around two and one-half years, ending its operations in early 1990. Police testimony indicated that the street price of a kilogram of cocaine was $200,000. At this price, 200 grams of cocaine per week were distributed in 1987 and in the first half of 1988 and 300 grams of cocaine per week were distributed in the second half of 1988 and in 1989. This amounts to 5.2 kilograms of cocaine in the last half of 1987, 13.0 kilograms in 1988, and 15.6 kilograms in 1989. Other witnesses gave varying estimates of the amount of cash taken in on a given shift, most of which exceeded those given by Springs. Three witnesses, for example, testified that the least amount of money they had seen on a shift was $4,000, whereas Springs testified that he had seen as little as $1,000. Springs's figures thus appear to be conservative compared to those of other witnesses. Because these witnesses' testimony readily supports finding that over fifteen kilograms of cocaine was distributed at Cozy's during the course of the conspiracy, the district court did not clearly err in attributing fifteen kilograms to the conspiracy for purposes of sentencing.

### IV

Both Defendants challenge the sufficiency of evidence to support their convictions. We review the sufficiency of the evidence under the familiar standard of *Jackson v. Virginia*, 443 U.S. 307, 319,

---

3. Chambers objected to many of the factual findings outlined in the presentence report, and the district court may have relied upon many of these disputed facts in finding that Chambers was a supervisor. The district court failed to make specific factual findings resolving these objections as required under *United States v. Morgan*, 942 F.2d 243, 245 (4th Cir.1991). The district court should address Chambers's objections on remand.

99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), which inquires whether "any rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt," and requires us in applying the standard to construe the evidence in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced.

*United States v. Giunta*, 925 F.2d 758, 764 (4th Cir.1991).

■ Defendants were each convicted of two counts involving conspiracies. In a conspiracy case, the Government must show that: (1) a conspiracy existed; (2) the Defendants had knowledge of the conspiracy; and (3) the Defendants voluntarily became part of the conspiracy. *United States v. Bell*, 954 F.2d 232, 236 (4th Cir. 1992). "[T]he existence of a conspiratorial agreement need not be proven by direct evidence, but may be inferred from the facts and circumstances of the case, i.e., circumstances indicating that two or more people acted in concert to achieve an illegal goal." *United States v. Laughman*, 618 F.2d 1067, 1074 (4th Cir.1980), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980).

■ Ned Johnson's testimony is sufficient to support Defendants' convictions for conspiracy to distribute cocaine. Ned Johnson testified that he hired Defendant James Isaac Johnson to work at the front door of Cozy's where he identified customers before allowing them entrance into the drug house. He eventually became a shift manager. Ned Johnson also testified that Defendant Chambers's principal job was to go to the stashhouse where the cocaine was stored, break down the cocaine, package it in sandwich bags, and transport the bags to Cozy's. From this evidence the jury could have inferred an agreement to distribute cocaine, knowledge of the agreement, and voluntary participation in the conspiracy.

■ The strongest evidence supporting Defendants' convictions for conspiracy to conduct an illegal gambling business was the testimony of Gloria Jean Holloway, the bookkeeper of the gambling operation. She testified that the Defendants brought tickets to the bank where the winning tickets were determined. After Holloway determined which tickets were winners, the Defendants would take the tickets to a storage place. Ned Johnson, who also headed the gambling conspiracy, testified that both Defendants knew that they were transporting lottery tickets because the Defendants were occasionally asked to look in the envelopes and see whether any of the tickets had a winning number. This evidence indicates that the Defendants acted in concert with Holloway, Ned Johnson, and other conspirators to conduct an illegal gambling operation. Circumstances indicating that parties acted in concert to achieve a criminal goal are sufficient to support the inference of an agreement or conspiracy. *Bell*, 954 F.2d at 236. Ned Johnson's testimony that the Defendants knew the envelopes contained lottery tickets supported finding that the Defendants knew of the conspiracy and voluntarily participated in it. The Government therefore produced sufficient evidence to support the convictions for conspiracy to conduct an illegal gambling operation. Holloway's testimony also established that the conspirators conducted a gambling operation that was illegal under North Carolina law; thus, the evidence supported Defendants' conviction on that count as well.

V

■ At trial, Defendants sought to impeach the testimony of Gloria Jean Holloway by introducing the results of a polygraph examination she had failed to pass. Defendants urge that the district court erred in excluding all evidence of the results of the polygraph examination. We disagree. In *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1134 (4th Cir.1991), we held that the results of a polygraph examination were not admissible to impeach the credibility of a witness. We explicitly rejected the argument that the results of a polygraph examination are admissible as exculpatory as opposed to incul-

patory evidence. The district court, therefore, did not err in excluding the polygraph evidence.

## VI

For the foregoing reasons, we affirm Johnson's conviction and sentence. We affirm Chambers's conviction, vacate his sentence, and remand for resentencing.

No. 91–5190: AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

No. 91–5191: AFFIRMED.

WIDENER, Circuit Judge, concurring in part and dissenting in part:

I concur in all of the majority opinion except part II(D), and as to that and the result, I respectfully dissent. I would affirm the judgment of the district court.

I suggest that the majority's holding implicitly requires more specific findings of fact in sentencing determinations than are required for findings of guilt. Because a district court, absent a special request by a defendant, does not have to make specific findings of fact when determining guilt, we should not place a greater burden on a district court when determining a sentence.

Fed.R.Crim.P. 23(c) states that a district court shall make general findings of fact when determining guilt in a trial without a jury. The district court is only required to make specific findings of fact if the defendant so requests before the court makes its general finding. See Rule 23(c). If no such request is made, the district court has no obligation to make specific findings and we will affirm if sufficient evidence is in the record to support the district court's determination. *United States v. Bolles*, 528 F.2d 1190, 1191 (4th Cir.1975). Fed. R.Crim.P. 32(c)(3)(D) should be considered analogous to the special request provision of Rule 23(c) with regard to a district court's reliance on pre-sentence reports in determining a sentence. In *United States v. Terry*, 916 F.2d 157, 160 (4th Cir.1990), we stated that we found persuasive the holding that a pre-sentence report may serve as the sole factual basis for sentence determination. Under Rule 32(c)(3)(D) if a

defendant objects to the factual accuracy of a presentence report before sentencing, the district court must make specific findings of fact before relying on the presentence report or must state that no finding is necessary because the controverted matter will not be considered in determining a sentence. See Rule 32(c)(3)(D); *United States v. Brooks*, 957 F.2d 1138, 1150 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992).

Although Chambers did object to his presentence report, the majority does not base its remand on this objection and the consequent operation of Rule 32(c)(3)(D). Instead, the remand is because "[W]e find no basis in the record for concluding that the district court considered the factors outlined in application note 3 in making this finding." I believe that Rule 32(c)(3)(D) applies in this case and that the district court has fulfilled its obligation under Rule 32(c)(3)(D). Chambers objected to his presentence report stating that he was not involved in five "drug houses"; that he did not know the whereabouts of the cocaine source; that he was not a "bag man"; that he was not "high ranking"; that he was not a "supervisor"; and that he was only "an individual who transported drugs and picked up money." (JA 74950). After a hearing on these objections at which both Chambers's counsel and the United States Attorney argued, the district court held that Chambers clearly was "at least a supervisor at some level," (JA 730) within the conspiracy. The district court based this finding upon both argument of counsel and testimony at trial. Under Rule 32(c)(3)(D), this is adequate and is supported by sufficient evidence in the record. *United States v. Feldman*, 853 F.2d 648, 665 (9th Cir.1988) (holding that district court substantially complied with Rule 32(c)(3)(D)(ii) by relying on evidence at trial and verdict of jury rather than facts objected to in presentence report), *cert. denied*, 489 U.S. 1030, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989).

It is clear from the record that Chambers was a manager or supervisor within the conspiracy. Chambers was responsible for

opening Cozy's each morning and making certain that the fire, which burned all year round for the purpose of disposing of drugs if a bust occurred, was started. Chambers also wore a beeper so that the people at Cozy's could contact him if drugs were running low or they had too much money. Once contacted, Chambers would either bring drugs to the house, come to the house to collect the money, or both. Chambers kept Cozy's supplied because he was one of only two people who had knowledge of and access to the "Stash House" where the supply of cocaine was kept. At the Stash House Chambers would cut and package large blocks of cocaine into small "25–cent bags." * These facts and especially Chambers's access to the Stash House indicates Chambers's high ranking role in the conspiracy because only the trusted conspirators were allowed so to handle the cocaine. The evidence also indicates that Chambers played a similar role with regard to the gambling operation.

Based on the district court's specific finding and the evidence in the record, I would affirm the district court's sentence determination.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

In the main I agree, but in one respect concerning the sentencing of Walter Chambers, I dissent. He was given a three level enhancement called for in the Sentencing Guidelines for being a supervisor or manager. U.S.S.G. § 3B1.1(b). Section 3B.1 of the Sentencing Guidelines calls for increases in the case of an organizer, a leader, a manager or a supervisor. The majority makes, I believe, an unwarranted assumption that § 3B.1 may refer to and covers management of inanimate objects. It appears evident, and the majority apparently agrees, that "organize, lead or supervise" must be of persons.

* A 25–cent bag sold for $25.

**1.** In *Fuentes,* it was held:

We acknowledge at the outset that a person can aptly be described as "managing" or "supervising" a building, investments, or many other tangible or intangible "things." Nevertheless, we believe that in the context of

What authority there is is consistent that management of persons is required to bring § 3B.1 into play. Persons only, and not inanimate objects, are within the scope of supervision or management for the purposes of the Sentencing Guidelines. *United States v. Fuller,* 897 F.2d 1217 (1st Cir.1990); *United States v. Fuentes,* 954 F.2d 151 (3rd Cir.1992), *cert. denied,* — U.S. —, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992);[1] *United States v. Mares–Molina,* 913 F.2d 770, 773 (9th Cir.1990); *United States v. Reid,* 911 F.2d 1456, 1464 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991). Only the Eighth Circuit has appeared at one time to have ruled the other way. *United States v. Johnson,* 906 F.2d 1285, 1291 (8th Cir.1990). Yet, in a later case, *United States v. Rowley,* 975 F.2d 1357 (8th Cir. 1992), the Eighth Circuit seemed to draw back. The *Rowley* decision approvingly quotes the First Circuit's conclusion that:

... [t]he defendant must have exercised some degree of control over others involved in the commission of the offense, or he must have been responsible for organizing others for the purpose of carrying out the crime. This requirement is implicit in the terms "organizer, leader, manager and supervisor," each of which suggest the presence of underlings or subordinates.

*Fuller,* 897 F.2d at 1220. The Eighth Circuit in *Rowley* in a footnote explains that "we have always required evidence that the defendant directed or procured the aid of underlings." *Rowley,* 975 F.2d at 1364 n. 7.

The Fourth Circuit in *United States v. Paz,* 927 F.2d 176 (4th Cir.1991), made a glancing remark on which the majority depends to depart from the holdings by the other circuits and to justify the three level enhancement given to Chambers by the district court in meting out punishment:

§ 3B1.1, it makes more sense to confine the terms "managing or supervising" to the narrower sense in which they are commonly used, as referring to the management or supervision of other people.
*Fuentes,* 954 F.2d at 153.

[E]vidence indicated that Paz controlled the money, drug products and residences where the drug trafficking was performed. From this evidence, the district court concluded that Paz was a manager of the enterprise. We are not persuaded to say that this factual determination was clearly erroneous.

*Paz,* 927 F.2d at 180.[2] In *Paz,* in any event, the remark: "money, drug products and residences" only addressed the *substantiality* of the things managed, being silent as to their nature. Nothing in the holding evaluated the meaning of § 3B1.1(b). More specifically, the *Paz* decision does not in any way weigh the legal distinction at issue here—namely, management of persons versus management of property. As to that by no means insignificant point, the *Paz* court appears to have assumed that "supervision" or "management," under the Sentencing Guidelines, extended to either supervision of persons *or* of property, there having been no contention by the parties to the contrary.

It is undisputed that the evidence was restricted to management by Chambers of inanimate objects, *i.e.,* of property such as the drug cocaine itself. No proof appears in the record of supervision of or management by Chambers of one or more persons.

In all events, *Paz* is not a holding on the precise point here involved. It, therefore, is not a binding precedent as a decision of another Fourth Circuit panel. *Compare North Carolina Utilities Comm'n v. Federal Communications Com.,* 552 F.2d 1036, 1044 n. 8 (4th Cir.1977), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977) (holding that only an *en banc* court,

not a subsequent panel, has authority to overturn a previous panel's published decision), with *Hales v. Winn–Dixie Stores, Inc.,* 500 F.2d 836, 849 (4th Cir.1974) (holding that a subsequent panel is not bound by a previous panel's decision where that decision does not specifically address the question at hand).

It is not surprising that what authority there is, to a great extent, in fact altogether, fails to support the majority's position. In the first place there is the effect on the meaning of "manager" of its linking with "organizer, leader or supervisor." One rule of statutory construction is *noscitur a sociis* ("One may be known by the company one keeps"). *Noscitur a sociis,* like other rules of statutory construction, is applied to give effect to, but not to subvert or defeat, the legislative intent or purpose in enacting the statute.

> "The maximum noscitur a sociis, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the acts of Congress."

*Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2627, 120 L.Ed.2d 407 (1992) (Blackmun, J. concurring) (quoting *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1581, 6 L.Ed.2d 859 (1961)).

The Supreme Court in *Jarecki* applied the doctrine in a way relevant here. At issue in *Jarecki* was the meaning of the word "discovery" in the following statuto-

---

**2.** Paz sought to escape classification as a manager on the grounds that he was a courier and not in control. No argument was made that control of inanimate objects was not sufficient and it was probable that residences controlled by Paz were occupied by others as residents. Paz pled guilty to maintaining a residence and there were witnesses who established cooking of crack by him and others which took place at the residence. *See United States v. Thomas,* 932 F.2d 1085, 1092 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 264, 116 L.Ed.2d 217 (1991); *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 447 (1991); and *cert. denied,* —— U.S. ——, 112 S.Ct. 887, 116 L.Ed.2d 791 (1992):

Robinson's arrangement of a place to store the proceeds and undistributed crack included not only renting apartments, but actually purchasing and using an apartment complex to house a crack joint. This is sufficient involvement, even ignoring Robinson's other activities, to support the inference that Robinson "exercised some degree of control over others involved in the commission of the offense or [was] responsible for organizing others for the purpose of carrying out the crime." *United States v. Fuller,* 897 F.2d 1217, 1220 (1st Cir.1990).

ry phrase defining "abnormal income" under the tax code:

> Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months.

The *Jarecki* Court began by looking at "the face of the statute":

> "Discovery" is a word usable in many contexts and with various shades of meaning. Here, however, it does not stand alone, but gathers meaning from the words around it. These words strongly suggest that a precise and narrow application was intended by § 456 [the phrase at issue]. The three words in conjunction, "exploration," "discovery" and "prospecting," all describe income-producing activity in the oil and gas and mining industries, but it is difficult to conceive of any other industry to which they all apply.... The application of the maxim [noscitur a sociis] here leads to the conclusion that "discovery" in § 456 means only the discovery of mineral resources.

*Jarecki*, 367 U.S. at 307, 81 S.Ct. at 1581. The four words in conjunction, "organizer," "leader," "supervisor," and "manager," all describe control over persons; it is difficult, if not impossible, to construe them all as describing control over inanimate objects. Thus, the application of *noscitur a sociis* would lead to the conclusion that "manager" in U.S.S.G. § 3B1.1(b) means only a manager of persons.

Secondly, Congress sought in enacting the Sentencing Guidelines to achieve "reasonable uniformity in sentencing ... for similar criminal offenses." United States Sentencing Commission, *Guidelines Manual*, § 1A2.3 (Nov. 1992). The Guidelines Commission itself in the Answer to Question No. 73 in "Questions Most Frequently Asked About The Sentencing Guidelines" states:

> For example, a defendant convicted of the offense of managing a "crack house" (§ 2D1.8) does not automatically receive an aggravating role adjustment. The

crack house manager must have actually organized, led, managed, or supervised others in the course of running the establishment in order to apply an aggravating role adjustment under § 3B1.1.

Thirdly, the word "manager" is ambiguous, possessed of differing meanings. It may, standing alone, mean control of inanimate objects, but it may be restricted to control of animate objects.[3] Given the existence of a decided majority of the authorities holding that management must be of persons and with no binding precedent in the Fourth Circuit to the contrary, we should follow the existing authorities. The rule of lenity requires us to adopt the more lenient construction. *See United States v. Batchelder*, 442 U.S. 114, 121, 99 S.Ct. 2198, 2202, 60 L.Ed.2d 755 (1979); *United States v. Mobley*, 956 F.2d 450, 452 (3d Cir.1992); *United States v. Payne*, 952 F.2d 827, 830 (4th Cir.1991); *United States v. Martinez*, 946 F.2d 100, 102 (9th Cir. 1991); *United States v. Rolande–Gabriel*, 938 F.2d 1231, 1237 (11th Cir.1991); *United States v. Burke*, 888 F.2d 862, 866 (D.C.Cir. 1989).

In summation, the First Circuit sums it all up well:

> The application notes to section 3B1.1, which state the factors to be considered in distinguishing "organizers and leaders" from "managers and supervisors," for purposes of applying sections 3B1.1(a) and (b), further indicate that some degree of control or organizational authority over others is required.

*Fuller*, 897 F.2d at 1220. Following the other circuits, all of whom recognize that for Sentencing Guidelines § 3B.1 purposes management means control of another person, will achieve the desirable congressional objective of rendering application of the Sentencing Guidelines uniform.

I, accordingly, on the point of the three level enhancement, dissent, and would vacate the sentence and remand for resen-

---

**3.** "Manage," according to the Oxford English Dictionary, relates to "training, handling and directing of a horse in its paces." Unquestionably, Man-o-War was animate.

tencing without applying the three level enhancement to Chambers.