**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-4176**

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

    v.

WAYNE THOMAS BURNLEY,

          Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg. Norman K. Moon, Senior District Judge. (6:17-cr-00013-NKM-1)

Argued: December 11, 2020            Decided: February 19, 2021

Before GREGORY, Chief Judge, KING, and DIAZ, Circuit Judges.

Vacated and remanded with instructions by published opinion. Chief Judge Gregory wrote the opinion, in which Judge King and Judge Diaz joined.

**ARGUED:** Neal Lawrence Walters, SCOTT KRONER, PLC, Charlottesville, Virginia, for Appellant. Laura Day Rottenborn, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee. **ON BRIEF:** Thomas T. Cullen, United States Attorney, R. Andrew Bassford, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

GREGORY, Chief Judge:

While in prison for fleeing a traffic stop, the defendant discussed his drug business with friends and family on the outside. His communications attracted the attention of a federal narcotics trafficking investigation. He was eventually indicted and convicted on conspiracy charges as part of a sweeping crackdown on the methamphetamine supply in Virginia. At sentencing, the district court imposed three enhancements. The defendant now challenges its application of the enhancement for reckless flight under U.S.S.G. § 3C1.2 and the "manager or supervisor" leadership enhancement under U.S.S.G. § 3B1.1(b). Though we find no error in the district court's reckless flight conclusion, we find that its explanation for applying the leadership enhancement precludes meaningful appellate review. We vacate and remand with instructions.

**I.**

Wayne Burnley was a methamphetamine dealer in central Virginia. Burnley was driving in Nelson County late one night in April 2015, accompanied by a friend, when officers pulled him over for running a stop sign. Deputy Sergio Sanchez and Officer Brian Sites of the Nelson County Sheriff's Office asked the passenger to exit the vehicle. As the officers spoke with the passenger, Burnley fled the scene, rolling over Officer Sites's foot as he pulled away. A high-speed pursuit followed on winding country roads. Burnley turned onto a logging road, leading to a collision of the vehicles, and the chase briefly continued until Burnley ended up stuck in an embankment.

2

Burnley was subsequently convicted on state charges of eluding the police and sentenced to five years of incarceration. In letters, emails, and phone calls from prison, Burnley communicated with his family, friends, and associates from the drug trade about their ongoing criminal activities. Local law enforcement passed along Burnley's messages to DEA agents who were investigating organized drug trafficking in the region.

To broadly summarize, the communications revealed Burnley's attempts to continue earning money while incarcerated and to secure the well-being of certain love interests and family members. Burnley's primary asset was his connection to Alonso Campos-Zacharias, known only as "Mario" to the conspirators. As Burnley's supplier prior to his arrest, Mario was able to source bulk quantities of methamphetamine from Mexico. From prison, Burnley attempted to connect Mario with trusted friends on the outside in exchange for a cut of the resulting proceeds. Burnley attempted to "hook up" at least three contacts this way: his cousin, his ex-girlfriend, and his niece. In each instance, Burnley was denied his end of the bargain. At one point, Mario and Burnley's cousin were distributing more methamphetamine together than Burnley ever had. They agreed to deceive Burnley about their dealings because they feared he was talking too much from prison. Much of Burnley's writings consist of his grievances against those who have not paid him his due, alongside his attempts to cajole them into doing right by him.

Ultimately, federal charges were filed against over a dozen defendants connected along the methamphetamine supply chain in Virginia, including Burnley and several of his contacts. Burnley and three co-defendants were charged with conspiring to possess, with intent to distribute, 500 grams or more of methamphetamine from January 2014 to

3

December 2017. Burnley alone proceeded to trial. At trial, Deputy Sanchez testified regarding the initial arrest, DEA Agent Todd Farris testified regarding the federal investigation, and Burnley took the stand himself. Seven additional witnesses—many of them among the cast of characters from the prison letters, all of them implicated by the investigation—testified against Burnley.

The jury found Burnley guilty. At sentencing, the pre-sentence report ("PSR") calculated a base offense level of 34 and recommended three enhancements: a three-point leadership enhancement under U.S.S.G. § 3B1.1(b) for acting as a "manager or supervisor"; a two-point enhancement for obstruction of justice under U.S.S.G. § 3C1.2 for recklessly creating a substantial risk of death or injury while fleeing the police; and a two-point enhancement for obstruction of justice under U.S.S.G. § 3C1.1 for attempting to impede the administration of justice. This resulted in a total offense level of 41 and, with Burnley in criminal history category VI, a guidelines range of 360 months to life.

Burnley objected to the leadership enhancement and the flight-based obstruction enhancement. The district court overruled his objections, adopting the PSR's calculation. The court sentenced Burnley to 300 months of imprisonment, minus the 36 months served in state prison, for a total term of 264 months; a downward variance. Nevertheless, the sentence was the longest of any conspirator. Burnley timely appealed.

## II.

First, Burnley argues that the district court erred in imposing the three-point leadership enhancement for acting as a manager or supervisor of criminal activity. He

4

contends that the evidence does not support a finding that he managed or supervised anyone. Second, Burnley challenges the district court's finding that his flight from the police created a substantial risk of death or bodily harm. He argues that the district court's reasoning amounts to a categorical rule under which any flight from the police would be subject to the enhancement. We review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Pena*, 952 F.3d 503, 512 (4th Cir. 2020).

We agree that there is some contrary evidence as to the leadership enhancement. Ultimately, though, the district court's explanation is insufficient to facilitate meaningful appellate review, so we remand for further fact-finding and resentencing. We also agree that the reckless flight enhancement should not categorically apply to all flights by car. That is of no moment here, however, because we find no error in the conclusion that Burnley's flight created a heightened degree of risk, appropriately justifying the enhancement.

**A.**

Section 3B1.1 of the Sentencing Guidelines allows for sentencing enhancements based on a defendant's leadership role in the offense. U.S.S.G. § 3B1.1 cmt. (backg'd) (considering "the size of a criminal organization" and "the degree to which the defendant was responsible for committing the offense"). Section 3B1.1(b) provides for a three-point enhancement "[i]f the defendant was a manager or supervisor (but not an organizer or

5

leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b).[1]

The Guidelines do not define the terms "manager" or "supervisor," so we apply their common meanings. *See, e.g.*, *United States v. Chambers*, 985 F.2d 1263, 1267 (4th Cir. 1993) (finding the defendant did not act as a "supervisor" because the evidence did not show that he "supervised people," and "no one testified that [he] performed a single supervisory task"); *id.* at 1268 (relying on dictionary definitions of "manager" as one who directs people). In so doing, the sentencing court "must consider seven factors":

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

*United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009) (quoting U.S.S.G. § 3B1.1, cmt. n.4).

Based on these factors, we have approved of the enhancement where defendants directed organized drug trafficking by managing and advising street-level dealers, setting prices and payment terms, and arranging acquisition and delivery logistics. *See, e.g.*, *United States v. Kellam*, 568 F.3d 125, 147–48 (4th Cir. 2009); *United States v. Bartley*, 230 F.3d 667, 673–74 (4th Cir. 2000); *United States v. Al-Talib*, 55 F.3d 923, 932 (4th Cir. 1995); *see also United States v. Llamas*, 599 F.3d 381, 390 (4th Cir. 2010) (approving enhancement because defendant, in fraud case, "exercised supervisory responsibility" by

---

[1] Burnley does not contest that his offense involved five or more participants.

"controlling . . . operators," "enforc[ing] . . . rules," and "punish[ing] employees who failed to abide thereby"). In contrast, we held the enhancement was misapplied to a drug trafficker where there was no evidence that he ever "exercised supervisory responsibility." *United States v. Slade*, 631 F.3d 185, 190–91 (4th Cir. 2011). That was so even though the defendant was a "mid- to upper-level" member of the trafficking ring, selling drugs "to his own clientele" and "to other members of the conspiracy who, in turn, sold the drugs to their clientele." *Id.*; *see also United States v. Sayles*, 296 F.3d 219, 226 (4th Cir. 2002) ("[B]eing a buyer and seller of illegal drugs . . . does not establish that a defendant has functioned as a[] . . . manager or supervisor of criminal activity."). Indeed, in *Slade*, a co-conspirator was responsible for chauffeuring the defendant to his buyers, and various co-conspirators sold drugs "for" him, yet those facts "d[id] not justify the imposition of an enhancement for a management or supervisory role." 631 F.3d at 190–91.

Here, the district court provided the following explanation for its imposition of the leadership enhancement:

> I think the evidence here is—the presentence report, I think, is accurate, and the facts bear out that he was—by a preponderance of the evidence at least, he was a manager at different times of Constance Layman, Kathleen Varner. He instructed Varner to collect money for him, and instructed his sister, Rebecca Burnley, who was not indicted but is a part of the conspiracy, to move money on his behalf. And so I think the evidence of what was going on from the jail satisfies that at least by a preponderance of the evidence. I don't think there's much question of that.

J.A. 370–71.

This explanation is insufficient to facilitate meaningful appellate review. *See Chambers*, 985 F.2d at 1269. As in *Chambers*, "[w]e find no basis in the record for

7

concluding that the district court considered the factors . . . in making this finding." *See id.* True, in *Chambers*, the district court stated only that the defendant "was at least a supervisor at some level," whereas here, the court referred to a few facts. *See id.* But those facts were not connected to any analysis of the seven available factors. *See id.* As a result, it is unclear why the listed facts require the conclusion that Burnley "exercised supervisory responsibility" or "acted as a manager" over others in an organized criminal enterprise. *See Llamas*, 599 F.3d at 390; *Al-Talib*, 55 F.3d at 932; *Slade*, 631 F.3d at 190–91.

For example, the district court found that Burnley "was a manager at different times" of Layman and Varner. It cited no facts as to Layman and only one as to Varner, that Burnley instructed her to collect money on his behalf. The record establishes that, prior to his incarceration, Burnley supplied Layman with methamphetamine. She then sold drugs to her own clientele, setting her own prices. Burnley also supplied Varner, sometimes for money and sometimes for free. There was no evidence of Burnley's subsequent control over Layman's and Varner's dealing. They each had accompanied Burnley on trips to meet his supplier. They were also present while Burnley processed, hid, or retrieved stashes of drugs, and sometimes they assisted. Both women were also romantically involved with Burnley. Later, while in prison, Burnley connected Layman with his supplier, Mario. He repeatedly demanded payment in exchange for doing so but Layman never paid him. It is unclear what evidence the district court's generalized assessment refers to and why it supports a finding of management as opposed to mutual participation in drug trafficking. *See Slade*, 631 F.3d at 190–91; *see, e.g.*, *United States v. Baker*, 539 F. App'x 299, 304–05 (4th Cir. 2013) (finding clear error where the evidence

8

showed only that three conspirators "all acted cooperatively" when selling crack, "but not that they acted at [the defendant's] direction or under her control").

The district court's finding that Burnley directed others to move money for him from prison presents the same problem. While incarcerated, Burnley frequently asked family or friends to support Varner in his absence. Sometimes he asked that they at least pay the debts he believed they owed him to Varner instead. One witness testified that Burnley believed the witness owed him a debt, and Varner later "came by to collect" on one occasion. The witness never complied, though. J.A. 131–32. The witness did not testify that Burnley directed Varner to do so, and the district court did not explain why Varner's doing so was more indicative of management by Burnley, from prison, as opposed to self-interest. *See Chambers*, 985 F.2d at 1269; *see, e.g.*, *Baker*, 539 F. App'x at 305 (concluding, where defendant called his mother and asked her to collect a debt he was owed, and she did so, that "this one recorded instance in which she did something [the defendant] asked her to do" was insufficient to show leadership).

Last, the district court found that Burnley directed his sister, Becky Burnley, to accept money on his behalf. Becky Burnley did not testify at trial. One witness, Chris Mays, testified that *Mario* told him to pay the money that he owed Burnley to Becky. Mays did so once; later, though, it was Mays and Mario who decided together to cut Burnley out from their ongoing drug dealings. The only other witness who referred to Becky Burnley's activities was David Adcock. He agreed that "she was also in the drug business," but then stated, "I don't think her and Mr. Burnley were involved like that." J.A. 174. He testified that Burnley called his sister almost every day from prison. He said that Burnley "would

say he was going to send people by the house and stuff to see us, but we never would deal with him." J.A. 175. It is unclear here, too, what evidence the district court was referring to and why it supported the conclusion that Burnley managed or supervised Becky from prison. *See Chambers*, 985 F.2d at 1269.

The district court did refer to the PSR, and it may have found further support for its conclusion there. *See, e.g.*, J.A. 478 (stating, in PSR, that "[Burnley] told Rebecca to move money around on his behalf"). A district court may "adopt[] the PSR's findings *in toto*" as the factual basis for a sentencing decision so long as it clearly resolved any factual disputes. *United States v. Walker*, 29 F.3d 908, 911 (4th Cir. 1994). Nevertheless, an enhancement that rests only on a general citation to the PSR may still fail clear error review if the record as a whole runs contrary to that conclusion. *See In re Mosko*, 515 F.3d 319, 324 (4th Cir. 2008) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)) ("A finding of fact is clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'").

In support of the district court's conclusion, the government cites evidence from across the record purportedly showing that Burnley "directed" or "instructed" his co-conspirators. As detailed above, we are uncertain whether the evidence supports that characterization. Regardless, it is "'the district judge,' not an appellate court, [that] 'must make an individualized assessment based on the facts presented to [her].'" *United States v. Carter*, 564 F.3d 325, 329–30 (4th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 49–50 (2007)). "In reviewing this assessment, an appellate court may not guess at the

10

district court's rationale, searching the record for . . . any other clues that might explain" its sentencing decision. *See id.* Here, the district court made no such assessment and its rationale was indeterminable because it did not apply the relevant factors. *See Chambers*, 985 F.2d at 1269; *see, e.g.*, *United States v. Holman*, 354 F. App'x 791, 793 (4th Cir. 2009) ("[W]hile the district court properly adopted the findings of fact in the PSR, it erred by failing to specifically apply the USSG § 3B1.1, cmt. n.4 factors to those findings[.]").

Therefore, we ultimately do not reach issues of evidentiary sufficiency or error in the district court's factfinding. *See United States v. Horton*, 693 F.3d 463, 483–84 & n.3 (4th Cir. 2012) (Davis, J., concurring) ("Because our resolution of the dispositive legal issue . . . fully disposes of the sentencing claim as the case comes to us, we should stop there."). Instead, we find procedural error under *Chambers*. *See* 985 F.2d at 1269. Accordingly, we vacate the sentence and remand for further fact-finding and resentencing. *See id.* at 1267, 1269.

**B.**

Section 3C1.2 provides for a two-point enhancement "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. The term "recklessly" refers to "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4 cmt. n.1.

The district court applied this enhancement based on Burnley's flight from the traffic stop and the resulting chase. Burnley argues that the car chase was so run-of-the-mill that it cannot satisfy § 3C1.2's standard. He contends that the district court's conclusion effectively creates a categorical rule that the enhancement applies to vehicular chases, which amounts to error.

We agree that the fact of a vehicular flight, alone, does not necessarily justify an application of § 3C1.2. Something more is required. *See, e.g.*, *United States v. Harper*, 466 F.3d 634, 649 (8th Cir. 2006) (explaining that "[w]e have not held that § 3C1.2 categorically applies to high-speed chases," but "[w]e have determined . . . the enhancement applies when" additional facts created sufficient risk).

But there clearly was, in fact, something more here. Burnley fled the traffic stop while two officers were nearby interviewing the passenger of the vehicle. The officers were close enough that Burnley's car rolled over one officer's foot when he suddenly pulled away. The danger that Burnley's flight created at that moment alone satisfied § 3C1.2's "substantial risk" standard.[2]

It makes no difference that the officer was uninjured, that he yelled to his partner to pursue Burnley rather than wait behind with him, and that he subsequently caught up to the chase. Even if we accept that Burnley merely grazed the officer's foot, his reckless flight

---

[2] Afterwards, Burnley drove at relatively high speeds while fleeing on winding rural roads, eventually pulling onto a logging road where the chase continued. At one point the vehicles collided, and Burnley ultimately became stuck in an embankment. But we need not determine whether this kind of vehicular chase, in isolation, is of sufficiently heightened risk because Burnley's initial departure settles the inquiry.

nonetheless dramatically increased the *risk* of far more serious harm. *See, e.g.*, *United States v. Hale*, --- F. App'x ----, 2020 WL 6778949, at \*1 (4th Cir. Nov. 18, 2020) (per curiam) (holding that "the record amply supports the enhancement" where the defendant's "reckless driving created a substantial risk of harm to the arresting officers" and finding "[t]he fact that an arresting officer was injured while assisting" with the arrest "supports that the enhancement was properly applied"); *United States v. Bouler*, 351 F. App'x 822, 824 (4th Cir. 2009) ("A defendant fleeing from police by car, striking two vehicles en route, creates an obvious risk that a traffic accident may occur and cause serious bodily injury."). The district court did not clearly err by concluding that Burnley recklessly created a sufficiently substantial risk of death or serious bodily injury to another person.

III.

For the foregoing reasons, we find no error in the application of the reckless flight enhancement, but we find procedural error as to the leadership enhancement. We vacate the sentence and remand for further proceedings in accordance with this opinion.

*VACATED AND REMANDED WITH INSTRUCTIONS*

13