PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

v.

A. THOMAS THORSON,

      *Defendant-Appellant.*

No. 07-4787

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Roger W. Titus, District Judge.
(8:05-cr-00467-RWT)

Argued: September 24, 2010

Decided: January 28, 2011

Before NIEMEYER, MOTZ, and GREGORY,
Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Motz joined. Judge Gregory wrote a dissenting opinion.

---

## COUNSEL

**ARGUED**: Price Owen Gielen, NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, PA, Baltimore, Maryland, for Appellant. Michael Richard Pauze, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF**: Brian M. Boyle, NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, PA, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Diana H. Beinart, Trial Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

## OPINION

NIEMEYER, Circuit Judge:

After a jury convicted Thomas Thorson on one count of conspiring to defraud the United States of tax revenue, in violation of 18 U.S.C. § 371, and on three counts of aiding and assisting in the preparation and presentation of false income tax returns, in violation of 26 U.S.C. § 7206(2), the district court sentenced him to 108 months' imprisonment. Challenging his sentence on appeal, Thorson contends that the district court erred in (1) enhancing his sentence under U.S.S.G. § 3B1.1, as an "organizer or leader" of the tax fraud scheme; (2) enhancing his sentence under U.S.S.G. § 3C1.1, for obstruction of justice in providing falsified documents to the grand jury; and (3) imposing a sentence that did not serve the need "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

For the reasons that follow, we reject Thorson's arguments challenging his sentence and affirm the judgment of the district court.

## I

In 1995, Thorson and co-conspirators John Ross, Glendle Johnston, Thomas Franks, Paul Decker, and others designed a scheme to solicit others to invest in partnerships to purchase and subsequently donate cemetery lots in order to benefit from tax deductions available to the partnerships. Thorson and the other co-conspirators informed potential investors that the partnership had purchased cemetery sites at a low cost; that the sites would be held for longer than one year; and that the sites would then be donated to a charity at the end of the tax year, creating tax deductions in the amount of a higher appraised value of the sites, yielding a tax benefit to partners. IRS regulations provided that if a taxpayer owned a piece of property for less than a year before making a charitable donation of the property, the deduction for the donation was limited to the purchase price of the property. But if the taxpayer held the property for more than a year and then donated it, the taxpayer could claim a stepped-up deduction for the appraised value of the property.

The partnership had trouble recruiting investors in the beginning because the investors would need to wait two years to receive the tax benefit from their investment. Thus, in order to make the investment attractive, the partnership had to devise a way by which to purchase the cemetery sites, solicit investment participation, and donate the sites to obtain a deduction, all within the period of a single calendar tax year so that the investor could claim the deduction the following April.

For the tax years 1996, 1997, and 1998, Thorson formed three separate partnerships, one for each year, that terminated at the end of the year. During the given year, various co-conspirators, but mainly Johnston, purchased cemetery sites for that year's partnership at low prices and on December 31 of that year, donated the sites to charities (often the same entity from whom the sites were acquired). The partnership

then claimed a tax deduction for the substantially higher appraised value of the site on the partnership's tax return for the year. To satisfy the Tax Code requirement that the property be held for more than a year, Thorson fabricated documents to support a purchase date in the December before the beginning of the tax year. On the basis of the fabricated documents, the partnership was able to claim that it had held the cemetery sites for more than a year and, with that claim, was able to make the investment attractive to investors. Over the course of the three relevant years, investors paid the three partnerships more than $2.3 million for partnership interests and received $9.9 million in tax deductions.

Taking 1996 as an example, Johnston purchased cemetery sites for the 1996 partnership between March 1996 and the end of the year at a cost of $30 to $33 for each site. After the partnership donated the sites to charity on December 31, 1996, it claimed a deduction of $650 per site, the amount of the site's claimed market value, for a total deduction of $1.8 million. To participate in the partnership's 1996 tax deduction, investors paid the partnership a total of $494,416 for partnership interests, or 27.5% of the $1.8 million deduction. Because the cemetery sites cost a total of about $92,000, the co-conspirators realized a profit of over $400,000, representing the difference between the cost of the sites and the proceeds from selling the partnership interests to the investors. To be able to claim the deduction for tax year 1996, which was the same year that the sites were purchased, Thorson falsified the purchase documents to show that the sites had been purchased on December 23, 1995, which was more than a year before the sites were donated, on December 31, 1996. If the partnership had accurately reported when it had purchased the sites, it would have been able to claim as a deduction only the amount paid for the sites. In order to receive the stepped-up deduction, the partnership would have had to hold the sites into the next tax year, making the investment in the partnership unappealing to investors, as it would have tied up their money for another year.

Similar facts were shown for the partnerships relating to tax years 1997 and 1998, although the purchase price of the cemetery sites rose each year, to a maximum of $65 per site, and the number of investors increased.

At meetings with potential investors for the sale of partnership interests, Decker was the initial spokesman for the partnership. But to respond to details and concerns about the investment, he referred comments and questions to Thorson, who was a lawyer and who had implemented the legal structure to fraudulently take advantage of the stepped-up tax deduction allowed by the Tax Code. Thorson's participation in the enterprise was also advertized in some of the partnerships' marketing materials, which cited his expertise in tax and non-profit law. While some investors were willing to invest after Decker had made his presentation, others did so only after consulting with and receiving assurances from Thorson.

Over the three years, 1996, 1997, and 1998, Thorson's income from the partnership increased significantly, and he created mechanisms to conceal this income. He assigned his income from the partnerships to a corporation named AGH, Inc., which had recruited a lawyer to serve as president, but in name only. In actuality, Thorson retained all decisionmaking authority for AGH. Under Thorson's direction, AGH opened a Charles Schwab brokerage account, which did not have Thorson's name associated with it, and it deposited Thorson's income from the partnerships in the AGH Schwab account. Thorson did not report this money as income on his tax return but, instead, created paperwork suggesting that the payments to AGH were loans from a company called Mid-Atlantic Mortgage and Marketing Associates, Inc. When Thorson took money from the AGH Schwab account, he did the same. Thus, Thorson prepared a "demand promissory note" in 1998 "evidencing" a purported loan from Mid-Atlantic Mortgage to AGH and similar documents to "evidence" loans from AGH back to him. Several of these agree-

ments were falsely dated. Consistent with this cover-up scheme, the nominal president of AGH filed a 1998 corporate tax return for AGH, reporting that AGH had received a loan from Mid-Atlantic Mortgage and had made a loan to Thorson, and therefore had no income from the transaction.

In 1998, the IRS initiated a civil audit of the 1996 partnership's tax return, and the revenue agent made a formal request to the partnership for partnership agreements, documents related to the acquisition of cemetery sites, and partnership bank records for 1995-96. In responding to the request, Thorson prepared an index for the documents that were provided to the agent, and the documents so provided included an agreement dated December 23, 1995, purporting to evidence the partnership's purchase of a number of cemetery sites on that date. As it turned out, however, Thorson prepared the December 23, 1995 agreement in 1998 after the IRS requested the documents. This fabrication was established not only by the document's computer metadata, but also by contextual inconsistencies.

Even while the civil audit continued, a grand jury investigation began, and the grand jury subpoenaed various documents from the three partnerships. In response to the subpoena, Thorson produced not only the fabricated agreement dated December 23, 1995, but also another fabricated agreement for the purchase of cemetery sites, dated December 22, 1996.

Subsequently, the grand jury indicted Thorson with one count of conspiring to defraud the United States of tax revenue and three counts of filing false tax returns, and a petit jury convicted Thorson on all counts.

In sentencing Thorson, the district court accepted the presentence report's calculation of the offense level, level 21, based on the amount of loss caused by the criminal activity. The court then applied four enhancements: (1) a two-level enhancement under U.S.S.G. § 2T1.4(b)(1)(A), finding that

Thorson had derived a "substantial portion of his income" from the scheme; (2) a two-level enhancement under U.S.S.G. § 2T1.4(b)(2), finding that Thorson had engaged in sophisticated concealment; (3) a four-level enhancement under U.S.S.G. § 3B1.1, finding that Thorson was "an organizer or leader"; and (4) a two-level enhancement under U.S.S.G. § 3C1.1, finding that Thorson "willfully obstructed . . . justice." The resulting offense level of 31 yielded a recommended sentencing range of 108 to 135 months' imprisonment. After considering all of the factors under 18 U.S.C. § 3553(a), the district court sentenced Thorson at the low end of the recommended range, to 108 months' imprisonment.

On appeal, Thorson challenges the enhancement based on being an organizer or leader, the enhancement for willfully obstructing justice, and the reasonableness of his sentence because he received a sentence significantly heavier than those received by his co-conspirators and others in a purportedly similar situation.

II

For his principal argument, Thorson contends that the four-level enhancement based on his being an organizer or leader was not supported by the evidence and therefore was clearly erroneous.

Because the district court's findings as to whether Thorson was an organizer or leader are factual in nature, we reverse only if the district court's findings are clearly erroneous. *United States v. Carter*, 300 F.3d 415, 426 (4th Cir. 2002). Under this standard,

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it

would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

*Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985) (internal citations omitted); *see also United States v. Stevenson*, 396 F.3d 538, 542 (4th Cir. 2005).

In finding that Thorson was a leader or organizer, the district court stated:

First, there's no requirement that there be only one leader; and clearly, based on the testimony that I heard and the other information that's been brought to my attention in connection with the sentencing leads me to the conclusion that Mr. Thorson was clearly a leader of this.

I can recall, for example, the testimony of Mr. Decker, who described himself as a "go-fer." But when it came to describing Mr. Thorson, he referred to him as a "closer." Mr. Decker's role was to go out and find gullible pigeons and bring them in. None of those pigeons would have stayed inside the birds nest of this case but for Mr. Thorson, who was the person that was able to convince even people with the letters "CPA" after their name, and some people with the letters "J.D." after their names that, yes, this was a legitimate deal.

It is [also] very clear that but for his fundamental role as an architect of a large portion of this scheme that this transaction could—these transactions could

never have gone down and that he clearly was an organizer or leader.*

The Sentencing Guidelines provide that a defendant's sentence is subject to a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). And Application Note 2 adds that the defendant need not be an organizer or leader of all of the participants involved in the criminal activity so long as he was an organizer or leader "of one or more other participants." U.S.S.G. § 3B1.1 cmt. 2. The Application Notes also provide various factors for consideration in determining whether a defendant is an organizer or leader, such as the "nature of [the defendant's] participation in the commission of the offense," "the degree of participation in planning or organizing the offense," or "the nature and scope of the illegal activity." U.S.S.G. § 3B1.1 cmt. 4.

Thorson does not contest the fact that the conspiracy in this case involved five or more participants. Rather, he contends that the district court clearly erred in concluding, as a factual matter, that he was an organizer or leader of any of those participants.

The record, however, belies his claim. Indeed, it contains more than ample evidence to support the district court's finding that Thorson was an organizer or leader.

*First*, Thorson, who was a lawyer and performed the legal work to carry out the conspiracy, drafted the paperwork, and designed how the paperwork could, when fabricated or

---

*Thorson argues that the district court misconstrued Decker's testimony in making this statement, because Decker referred to Johnston, and not himself, as a "go-fer." This slip, however, was not material, as the district court accurately noted that Decker did, in fact, refer to Thorson as a "closer."

altered, take advantage of the tax deduction. Because the crime was essentially a paper crime committed with the fabrication of documentation to show that the partnership had held the cemetery sites for more than one year when it had not, Thorson's role was especially significant.

*Second*, Thorson was critical to the recruitment of investors. He provided Decker and other conspirators with instruction regarding the substance of the phony cover story to describe the investment, i.e., that existing contracts supported the necessary year-and-a-day holding period, a story that Decker in turn passed on to the investors. Indeed Decker never questioned Thorson about this claim but treated him as "the point man," to whom even Decker went "when he had questions about" the investments. In the same vein, in meetings with potential investors, Decker held Thorson out as the "expert" to address investors' questions and concerns. Decker invited investors to speak with Thorson, who, the evidence showed, explained the deal professionally and in plain terms to convince them; he was referred to as the "closer." Similarly, solicitation letters to potential investors provided, "Our attorney, Thomas Thorson, is an expert in this area and has been involved in several hundred transactions over the last 30 years which involved donating real estate and oil and gas properties to charity. He has never had a problem." There is detailed evidence in the record about how Thorson had multiple exchanges with individual investors in his effort to persuade them to invest. Indeed, evidence supports the conclusion that some investors would not have invested in a partnership were it not for Thorson's explanations and persuasion. It was a *modus operandi* of the partnerships that Decker bring potential investors through the door and that Thorson thereafter persuade them to purchase a partnership interest. A letter to investors detailed this process:

> The first step to get the ball rolling is for you to arrange with Jim and Steve an informal and cost-free telephone interview with Tom Thorson to see if this

is worth pursuing on your behalf. He will be able to determine quickly and confidentially whether or not you qualify. If you do . . . qualify, Mr. Thorson will be glad to review this unique program with your advisor at no cost to you. . . . After first speaking with Mr. Thorson, . . . who is a very qualified legal expert in this area, if you should have any questions, please feel free to give me a call . . . .

Another such letter states, "The legal issues relating to the form of this transaction have been monitored and will be confirmed by Thomas Thorson, Esquire of New York City, New York." On these facts, the district court found that the illegal activity would not have been successful were it not for Thorson's recruitment of investors.

*Third*, Thorson supervised and directed the collection of paperwork and supporting data necessary to document and consummate the fraudulent transactions. He gave various instructions to co-conspirators to obtain specified outside information and lists for him, and he directed them to obtain executed signature pages for the various agreements. Consistent with this role, Thorson maintained detailed files and documentation of all transactions involved in the illegal conspiracy. As the presentence report on Thorson accurately summarized,

> The defendant's authority and control over numerous aspects of the conspiracy is evidenced by his correspondence to other participants and their actions at his direction. Also, the defendant compiled documents and maintained binders containing key paperwork for each partnership including the partnership agreements, original signature pages, assignments, donation paperwork, lists of investors, and tax returns.

*Fourth* and finally, when Decker learned that the IRS had initiated an audit of one of their investors, he turned to Thor-

son, who assured Decker not to worry—"We'll deal with it." And when an IRS agent contacted Decker himself, Decker immediately called Thorson to receive instruction. In short, because Thorson had prepared the paperwork, designed the legal mechanisms for claiming the fraudulent deductions, answered questions, and issued directions in implementing the fraudulent scheme, he was in fact not only an organizer, but his co-conspirators regarded him as a leader.

Thus, the district court's findings that Thorson was the member of the conspiracy responsible for keeping the investors "inside the bird's nest" as he was the "closer"; that he was able to persuade people to invest in the partnerships; and that "these transactions could never have gone down" without him are amply supported by the evidence. Moreover, the district court's finding that Thorson was the architect of "a large portion of this scheme" is undisputed. That fact alone would have supported the district court's conclusion that Thorson was an organizer of the criminal activity. Because the district court addressed the relevant Guidelines factors, *see United States v. Chambers*, 985 F.2d 1263, 1269 (4th Cir. 1993), and its account of the evidence "is [at least] plausible in light of the record viewed in its entirety," *see Anderson*, 470 U.S. at 574, we cannot find that its findings are clearly erroneous.

III

Thorson also challenges his sentencing enhancement under U.S.S.G. § 3C1.1 for obstruction of justice, based on his production of fabricated or backdated documents to the grand jury. He contends that he should not be punished for his production of the fabricated or backdated documents to the grand jury because the documents were already part of the offense of conviction and his production of them was required by the grand jury's subpoena. He also contends that this enhancement is duplicative of the sentencing enhancement imposed on him under U.S.S.G. § 2T1.4(b)(2) for sophisticated concealment.

The government argues that if Thorson's sentence had not been enhanced for obstruction of justice, then he would have received a free pass with respect to providing false documents to the grand jury. The government referred to two fabricated purchase agreements, one created for production to the IRS during its civil investigation and subsequently produced to the grand jury and another one produced to the grand jury. The government also referred to the spreadsheet and letters created by Thorson to show that proceeds of the fraudulent scheme were transferred to AGH, Inc., and then back to Thorson, purportedly as loans.

The district court, relying on the Seventh Circuit's decision in *United States v. Furkin*, 119 F.3d 1276 (7th Cir. 1997), concluded that while the fabricated documents might have been part of the conspiracy's concealment efforts, they were also employed "to subvert the administration of justice during the investigation, prosecution and sentencing of an offense." *Id.* at 1285. It accordingly adopted the recommendation of the presentence report to enhance Thorson's sentence for obstruction of justice under U.S.S.G. § 3C1.1.

U.S.S.G. § 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Application Notes to the provision provide examples of obstructive conduct, including the "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." U.S.S.G. § 3C1.1 cmt. 4(c). To satisfy the requirements of

this enhancement, the defendant's obstructive conduct must have been willful, meaning that he must have "consciously act[ed] with the purpose of obstructing justice." *United States v. Romulus*, 949 F.2d 713, 717 (4th Cir. 1991) (quoting *United States v. Stroud*, 893 F.2d 504, 507 (2d Cir. 1990)). Thus, if a document had been falsified as part of the offense of conviction but *before* any investigation, the defendant's production of the falsified document in response to a subpoena would not support this enhancement, unless it were shown that the falsification was "purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 cmt. 1.

The willfulness element is essential. Not only is it explicitly included in the language of the Guidelines, but to impose the enhancement without that element would lead to making any production of falsified documents an automatic basis for the enhancement, creating an unacceptable dilemma for a defendant. To avoid the automatic enhancement, he would have either to withhold the fabricated documents from the grand jury, which would amount to obstruction of justice by refusing to comply with the grand jury subpoena, or to produce the documents with added corrections, which would implicate his Fifth Amendment right against self incrimination. We do not read the enhancement so broadly. Rather, we conclude that the willfulness element requires that either in producing or attempting to produce fabricated documents in the course of an investigation, a defendant must consciously act with the purpose of obstructing justice.

In this case, Thorson did more than simply respond to a grand jury subpoena by producing previously falsified documents. Rather, *during the civil IRS investigation* of his offense, he created documents to thwart the investigation. He fabricated a December 23, 1995 agreement in response to the IRS audit, with the purpose of providing documentation to support the tax deduction. Similarly, he fabricated another purchase agreement dated December 22, 1996, and produced

it, together with the fabricated December 23, 1995 agreement, to the grand jury. As the IRS audit and grand jury investigation both constituted investigations of his offense, we find no error in the district court's application of the enhancement under U.S.S.G. § 3C1.1. *See United States v. Fiore*, 381 F.3d 89, 94 (2d Cir. 2004) (holding that perjury during a related civil investigation constituted obstruction of justice under § 3C1.1).

Thorson argues further that *the same underlying conduct* gives rise to enhancements for both obstruction of justice and sophisticated concealment and that, therefore, the enhancements are duplicative. To be sure, "there is a certain amount of overlap among various factors as they relate to sophisticated means, obstruction of justice, departure, as well as the guideline for the underlying conspiracy," but each enhancement addresses different behavior and concerns. *Furkin*, 119 F.3d at 1284. An enhancement for sophisticated concealment under U.S.S.G. § 2T1.4(b)(2) addresses the usual efforts of a complex criminal enterprise to conceal its wrongdoing during the course of the criminal activity. In this sense, this tax conspiracy's widespread pattern of falsifying contracts and tax information gives rise to the sophisticated concealment enhancement. But that enhancement punishes the defendant's past efforts to avoid detection, whereas an obstruction of justice enhancement punishes conduct carried out with the purpose of frustrating an actual investigation. While there may be some overlap, the enhancement for obstruction of justice is based on the distinct conduct focused on frustrating or impeding the investigation. Accordingly, we reject Thorson's argument based on duplication.

IV

Finally, Thorson contends that his 108-month sentence was substantively unreasonable in that it ignored the prescribed consideration of § 3553(a)'s direction "to avoid unwarranted sentence disparities among defendants with similar records

who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6). Thorson relies on evidence presented to the district court which showed "that the average prison term for defendants who are convicted in cases involving between $2.5 million and $5 million is 46.6 months." He was sentenced to 108 months' imprisonment. Thorson also points to the sentences received by his co-conspirators, noting the fact that Ross received a sentence of 5 years' probation; Johnston received a sentence of 37 months' imprisonment; and Decker was given immunity in exchange for his testimony.

The district court, in lieu of relying on the statistics advanced by Thorson, which were drawn from other cases, noted that it was conducting an individualized assessment of Thorson's circumstances in this case based on factors identified in the Sentencing Guidelines and in 18 U.S.C. § 3553(a), that were applicable to him. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007).

The court began by properly calculating the recommended Sentencing Guidelines range, concluding that the recommended range was a sentence of 108 to 235 months' imprisonment. The court then considered the § 3553(a) factors in extensive detail, revealing its thinking as to each factor. The court explained why it rejected a variant sentence, as requested by Thorson, and imposed a sentence within the recommended Guidelines range, concluding that such a sentence would best serve the relevant sentencing purposes. The court stated:

> I consider this to be a tragedy for Mr. Thorson and his family, but it is also a tragedy for the legal profession. Mr. Thorson is a disgrace to the legal profession. There are those who take their law degree and use it in the best traditions of this profession . . . for promotion of good and the advancement of client's interest[s] and the legitimate practice of law,

and there are those who take that special training and use it not for good but for evil.

In this case, Mr. Thorson is not just a consigliere in the context of the godfather, but he was a significant leader of this enterprise. Indeed, as described by one of the co-conspirators, a closer. . . . [H]e was consistent in his deceptive manner. He was consistent in deceiving everybody, including the grand jury. He doctored documents, thumbed his nose at the Internal Revenue Code, and it is an extremely serious offense and one that deserves punishment.

The history and characteristics of the defendant do not, in my judgment, indicate that there should be substantial leniency. He has—as I've mentioned already, part of his history is obtaining a law degree, which he has used to further a criminal enterprise. It's understandable that he's a nice man, that he has a lovely wife, good children, went to church, but I cannot disregard the essential conduct in which he engaged and, accordingly, I conclude that there's little basis or reason why there should be leniency under those circumstances.

. . . Sometimes people think that a little old tax cheating is not a big deal. It is. Especially when it involves as much sophistication and devices as were concocted by this defendant and his coconspirators in order to cheat [the] Internal Revenue Service out of tax moneys to which it was entitled.

* * *

And as I've already indicated, in light of the seriousness of this offense and the need to deter others from engaging in fraudulent tax shelter schemes of this

nature, a sentence of incarceration—a significant one
—is required.

Addressing specifically the need to avoid unwarranted sentencing disparities, which is at the heart of Thorson's sentencing challenge, the court stated:

> I'm required to consider the need to avoid unwarranted sentence disparities among defendants with similar records that have been found guilty of similar conduct. I have considered the information provided to me by counsel for the defense. It is largely based upon the amount of the loss. It utterly fails to take into account all of the various variables that are before me, including the level of sophistication involved in this enterprise, the concealment, the obstruction of justice; so I find that to be of little help. What is more help to me is the application of the sentencing guidelines, which carefully consider all of these various factors and apply an appropriate offense level adjustment based on each one of those, all of which are designed with the goal of promoting a uniform system of sentencing.
>
> I, therefore, conclude that a sentence within the guidelines system is appropriate, does promote uniformity, and will fairly emulate all of the factors set forth in Section 3553.

After considering the § 3553(a) factors and addressing each one, the district court exercised its discretion to impose a sentence within the Sentencing Guidelines range and at the low end, finding that in doing so, it was accomplishing the Guidelines system's goal of uniformity.

We find no error or abuse of discretion in the sentence imposed. A sentence within the properly calculated Guidelines range is presumptively reasonable, *see United States v.*

*Raby*, 575 F.3d 376, 381 (4th Cir. 2009); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (authorizing appellate courts to presume that a sentence within the Guidelines range is reasonable), and Thorson has fallen short in his efforts to demonstrate otherwise.

For the reasons given, we affirm the judgment of the district court.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

At age sixty-seven, Thorson was the only co-conspirator against whom the government chose to press all charges and was able to obtain a conviction. The sentencing enhancements that the government requested, and the district court applied, increased Thorson's sentence ten levels, from a sentencing range of thirty-seven to forty-six months to a range of 108 months to 135 months. The district court clearly erred in imposing the two enhancements at issue here, adjustments for role in the offense and for obstruction of justice.

I.

At the outset, because of the short shrift the majority gives to the issues, I feel compelled to address the disparate sentences resulting from the government's conduct in this case, as well as some statements by the district court that seem to be the basis for Thorson's enhanced sentence. On September 29, 2005, defendants Ross, Johnston, Franks, and Thorson were indicted with one count of conspiracy to defraud the U.S. Treasury Department, in violation of 18 U.S.C. § 371, and three counts of aiding and assisting in the filing of false individual income tax returns, in violation of 26 U.S.C. § 7206(2). Prior to trial, the government dismissed three counts against co-conspirators and leaders Ross and Johnston after they entered into plea agreements, whereby each pled

guilty to one count of conspiracy. Ross was subsequently sentenced to only five years probation, and Johnston was sentenced to thirty-seven months imprisonment followed by three years of supervised release, a sentence at the bottom of Thorson's range without the numerous enhancements. The government then gave Decker, who played a role in the conspiracy arguably much greater than that played by Thorson, total immunity in return for his testimony at the trial of Thorson and Franks. At the conclusion of the trial, the jury found Thorson guilty on all counts and Franks not guilty on all counts. It was then that the government sought the four enhancements against Thorson.

After imposing the enhancements sought by the government, the district court made the following statement when discussing Thorson's sentence:

> I consider this to be a tragedy for Mr. Thorson and his family, but it is also a tragedy for the legal profession. Mr. Thorson is a disgrace to the legal profession. There are those who takes [sic] their law degree [sic] and use it in the best traditions of this profession of which I'm a member for promotion of good and the advancement of client's interest and the legitimate practice of law, and there are those who take that special training and use it not for good but for evil.

> In this case, Mr. Thorson is not just a concigliori [sic] in the context of the godfather, but he was a significant leader of this enterprise. Indeed, as described by one of the coconspirators, a closer. His offense is truly offensive to the court. . . .

J.A. 1121. Clearly the court took Thorson's conduct as a personal affront, but that justification is insufficient to support the government's piling on in this case. Beyond that fact, it is evident that Thorson's occupation weighed heavily on the

court's mind when arriving at a sentence approximately triple the original, unenhanced guidelines sentencing range. Given the lack of evidence to support the enhancements at issue and the court's apparent focus on Thorson's role as an attorney, it seems that if the court was intent on adjusting Thorson's sentence based on facts in the record, it could have applied a two-level enhancement for use of his special skill as an attorney under U.S.S.G. § 3B1.3, which the government requested. The court took a different course, one which the majority today endorses, and punishes Thorson on no evidentiary basis.

## II.

## A.

To qualify for a four-level increase under § 3B1.1(a) of the guidelines, a defendant must have been "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 3B1.1(a) (1998). We have recognized that "[t]he Sentencing Commission has indicated that a court should consider seven factors in determining" whether a defendant acted as an organizer or leader. *United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002). These include: "[1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. n.4.

There is no indication that the district court considered any of these factors, as it was required to do. To justify the adjustment in this case, the district court stated that "Mr. Thorson was clearly a leader" "based on the testimony that I heard and

the other information that's been brought to my attention." J.A. 1088. The court continued,

> I can recall, for example, the testimony of Mr. Decker, who described himself as a "go-fer."[1] But when it came to describing Mr. Thorson, he referred to him as a "closer." Mr. Decker's role was to go out and find gullible pigeons and bring them in. None of those pigeons would have stayed inside the birds nest of this case but for Mr. Thorson, who was the person that was able to convince even people with the letters "CPA" after their name, and some people with the letters "J.D." after their names that, yes, this was a legitimate deal.
>
> It is very clear that but for his fundamental role as an architect of a large portion of this scheme that this transaction could — these transactions could never have gone down and that he clearly was an organizer or leader.[2] I therefore conclude that the adjustment for role in the offense set forth in Paragraph 59 of the [PSR] is correct and I adopt that.

J.A. 1088-89. The court failed to cite any of the seven factors, making principally conclusory statements.

In *United States v. Chambers*, we remanded the case for resentencing because the district court failed to apply the factors to determine whether the defendant was a supervisor or manager:

---

[1]This is incorrect. Decker did not refer to himself as a go-fer but instead referred to Johnston as a go-fer for Ross.

[2]The court nor the PSR distinguishes between the terms "leader" or "organizer." Because the government treats "leader" and "organizer" as interchangeable and because being classified as either makes one eligible for the adjustment, I need not decide the difference between the two terms. Yet, as we recognized in *Sayles*, the court was required to decide the issue based on factors set out in the guidelines. 296 F.3d at 224. It did not.

> The district court's factual findings supporting the upward adjustment in Chambers's sentence were limited to a statement that Chambers "was at least a supervisor at some level." We find no basis in the record for concluding that the district court considered the factors outlined in application note 3 in making this finding. The evidence may or may not support the conclusion that Chambers was a manager or supervisor. However, *without specific factual findings showing that the district court evaluated the defendant's role in the offense in light of the factors in application note 3*, we cannot conduct meaningful appellate review of this issue. Accordingly, we vacate Chambers's sentence and remand.

985 F.2d 1263, 1269 (4th Cir. 1993) (emphasis added). We further held that "[o]n remand, the district court should apply the factors outlined in application note 3 and determine whether Chambers's role in the conspiracy was sufficiently extensive to warrant an increase in offense level under § 3B1.1(b)." *Id. Chambers* controls here. Because the district court in this case, like the district court in *Chambers*, did not cite any of the relevant factors and relied on conclusory statements instead of sufficient evidence in the record, I would remand for resentencing.

### B.

The one inaccurate example provided by the court and the court's citation to the PSR does not save the leadership enhancement. First, scouring the record for some evidence, however slight, to support the enhancement is not only outside of our role, but also does not satisfy the standard to which we adhere. "A finding of fact is clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re Mosko*, 515 F.3d 319, 324 (4th Cir. 2008) (quoting *United States v.*

*U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). On the record as a whole, I am left with the inescapable conclusion that the court mistakenly found Thorson to be a leader or organizer.

The "primary goal of § 3B1.1" is "the determination of a defendant's culpability relative to other participants in a criminal activity 'based upon the role the defendant played in committing the offense.'" *Chambers*, 985 F.2d at 1268; U.S.S.G. § 3B1.1, cmt. background ("This adjustment is included primarily because of concerns about relative responsibility."). The district court in this case in no way compared Thorson's role to the roles of other members of the conspiracy. Instead of focusing on relative culpability, the district court based the enhancement on its perception of the importance of Thorson's role in the conspiracy, describing Thorson as the "closer." This is erroneous for two reasons. First, the district court's description of Thorson as the "closer" is unsupported by the record. The court stated that "none of" the investors "would have stayed" in the scheme "but for" Thorson. J.A. 1089. This contradicts the testimony of Decker, who specifically stated that Thorson was only involved in marketing "as . . . needed" and that *some* investors turned to Thorson for legal information while others decided to invest solely based on Decker's presentation. J.A. 216-17, 225-26. Decker was the primary salesperson, and Thorson did not instruct Decker on how to market the program.

Second, as the Tenth Circuit has found, "the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, *not* for important or essential figures." *United States v. Anderson*, 189 F.3d 1201, 1211 (10th Cir. 1999) (emphasis added) (internal quotation marks and citation omitted); *United States v. Owens*, 70 F.3d 1118, 1129 (10th Cir. 1995) (remanding for resentencing because the fact that the defendant was "an important figure who was integral to the success of [the] conspiracy" was insufficient to justify an adjustment for leadership) (internal

quotations omitted). The district court here plainly found Thorson to be a vital member of the conspiracy, although based on a questionable interpretation of the evidence. But, as the case law shows, even if true, simply describing Thorson as the "closer" is inadequate to justify a leadership enhancement. Finding that Thorson convinced some investors to join the scheme fails to demonstrate that Thorson had any "control, organization, [or] responsibility for the actions of others." *Anderson*, 189 F.3d at 1211.

The court does cite to paragraph fifty-nine of the PSR, which provided that Thorson's

> authority and control over numerous aspects of the conspiracy is evidenced by his correspondence to other participants and their actions at his direction. Also, [Thorson] compiled documents and maintained binders containing key paperwork for each partnership including the partnership agreements, original signature pages, assignments, donation paperwork, lists of investors, and tax returns.

J.A. 1193. However, this paragraph describes nothing more than actions an attorney would typically take and does not demonstrate leadership of others. Moreover, the correspondence referred to in the PSR consists of two letters from Thorson that, while possibly meant to address "the degree of control and authority exercised over others," U.S.S.G. § 3B1.1, cmt. n.4, wholly fails to support that factor. The first letter asked the accountant, Galvin, to obtain signatures on partnership agreements, inquired about obtaining employer identification numbers, and requested certain documents for the files. If this letter demonstrates any control, it is over paperwork and not over persons. "[I]n assessing whether a defendant played an aggravating role in the offense of conviction, the key inquiry is whether the defendant's role was that of 'an organizer or leader of people,' as opposed to that of a manager over the property, assets, or activities of a criminal

organization." *United States v. Llamas*, 599 F.3d 381, 390 (4th Cir. 2010) (quoting *United States v. Cameron*, 573 F.3d 179, 185 (4th Cir. 2009)). Therefore, this letter is insufficient to justify the adjustment for leadership. The second letter actually shows that Thorson was acting at the direction of his client, Johnston. The letter, dated March 9, 1998, from Thorson to Johnston, enclosed documents with instructions for Johnston regarding signature and delivery and started by stating, "Here are the documents *you requested* . . . ." J.A. 968 (emphasis added). This letter suggests that Johnston had control over Thorson. The instructions to obtain signatures contained in the letter, again demonstrate, if anything, control over paperwork.

The PSR also cites Thorson's compilation and maintenance of paperwork. As stated, preparing the necessary paperwork and maintaining the partnerships' records is consistent with Thorson's role as an attorney brought in by Ross. While one can unquestionably be an attorney and a leader or organizer, there is no evidence that Thorson had control or management responsibility *over people* relative to other co-conspirators. Control over records is not enough to support the enhancement given. *See Llamas*, 599 F.3d 381, 390.

## C.

Conducting the proper analysis, according to *Chambers*, as the district court and the majority failed to do, it is apparent that Thorson was not a leader or organizer. First, the government failed to present evidence that Thorson was in charge of making major decisions. U.S.S.G. § 3B1.1, cmt. n.4 (listing as the first factor "the exercise of decision making authority"). Instead, evidence showed that Ross brought Thorson in to "help" with legal issues and marketing. J.A. 215. Additionally, Decker testified that Ross, not Thorson, was the "boss" who possessed decision-making authority. J.A. 299. Decker also testified to the following:

Q:  Now, again, consistent with Mr. Ross being the boss of these partnerships, is it fair to say that Mr. Ross was the one who decided how everyone was going to be compensated in the partnerships?

A:  That is correct.

Q:  That certainly applied to you, correct?

A:  Yes.

Q:  And your understanding was that applied to Mr. Johnston and Mr. Thorson as well, correct?

A:  That is correct.

Q:  And it was Mr. Ross who made the decision, did he not, that you would get your compensation in the form of these what you dispute as loans, but he wanted them described as loans, correct?

A:  It was his decision to issue the promissory notes, yes that's correct.

J.A. 302. While true that more than one conspirator may have control or decision-making authority, the evidence points to only Ross as possessing this leadership quality.

Second, "the nature of [Thorson's] participation," U.S.S.G. § 3B1.1, cmt. n. 4, was not one of an organizer or leader. As previously described, Ross recruited Thorson to provide legal advice and assist with marketing. J.A. 215. The trial court's factual finding that Thorson was a "closer" that was essential to sealing the deal with every investor conflicts with Decker's testimony that Thorson became involved only when potential investors requested clarification on the program's operation.

Decker described the marketing of the investment and Thorson's role as follows:

> I was well versed enough so that I could handle it. I would go on the appointments. I would make the initial presentation and if there was any follow-up needed, I would have Tom Thorson follow up with a phone call the next day or two just to kind of, you know, see if the investors had any questions, any concerns, and he would help me in — in some cases I didn't need it but in some cases I did. So, I just used his knowledge and expertise as I needed it . . .

> I just went out and met my clients, presented the investment, and some of them bought just based on what I told them. Some of them needed background help with follow-up calls from Tom Thorson.

J.A. 216-17, 225-26. Providing reassurance and explanation as necessary cannot convert a participant in this conspiracy into a leader. In fact, Decker's description of Thorson's role shows Thorson to only be acting as the partnerships' attorney by discussing the program's legal requirements with some potential investors when they had questions.

Third, Thorson did not recruit accomplices.[3] U.S.S.G. § 3B1.1, cmt. n.4 (listing "recruitment of accomplices" as a factor). The core team involved in this conspiracy was in place before Thorson came into the picture, and it was Ross who linked the parties together. In fact, Thorson was recruited

---

[3]The government completely misapplies the third factor, the recruiting of accomplices, dedicating four pages of its brief to showing that Thorson sometimes assisted in recruiting investors. In fact, the government incorrectly cites comment note four as factoring in "recruitment of participants," rather than "accomplices." The investors were not accomplices or alleged co-conspirators, and the government conceded as much at oral argument.

by Ross after Ross's previous attorney Ellinger was no longer involved. J.A. 297. Ross and Johnston knew each other for many years, having worked together before, and they began the program in 1995. Ross employed Decker as the salesperson to expand the program. Additionally, Franks, the accountant, was used because he had prior dealings with Ross.

Fourth, Thorson did not claim a right to a larger share of the profits, U.S.S.G. § 3B1.1, cmt. n.4 (listing "the claimed right to a larger share of the fruits of the crime" as a factor). Instead, he received significantly less money than both Ross and Johnston. Ross, receiving the largest share, claimed fifty-four percent of the total compensation: over two million dollars. Johnston received approximately $744,000, or nineteen percent of the total compensation. Meanwhile, Thorson and Decker both received approximately $500,000, or thirteen percent of the total compensation. J.A. 977.

Fifth, Thorson's "degree of participation in planning or organizing the offense," U.S.S.G. § 3B1.1, cmt. n.4, counsels against finding Thorson to be a leader or organizer. As discussed previously, Thorson was recruited by Ross after Ellinger, the previous attorney, was no longer involved. And, at the time of Thorson's joining, the basic format of the investment scheme was in place.

Sixth, Thorson did not exercise control and authority over others to an extent necessary to characterize him as an organizer or leader. Again, it must be pointed out that the court should have been guided by relative culpability. *See Chambers*, 985 F.2d at 1268; U.S.S.G. § 3B1.1, cmt. background. It is clear that Ross was the decision-maker of the group. Furthermore, evidence demonstrated that Decker, the salesperson, excised control over Thorson. Decker testified that Thorson did not instruct him on marketing, and that Decker "just used [Thorson's] knowledge and expertise as [Decker] needed it." J.A. 216-17, 225. Thorson may have had control over paperwork, but as discussed above, that is entirely inade-

quate to justify classifying him as an organizer or leader. *See Llamas*, 599 F.3d at 390.

The government argues that Thorson's role during the initiation of civil and criminal investigations illustrates that he was a leader or organizer. The government relies on testimony by Decker that he called Thorson after being contacted by the IRS, and that Thorson told him not to meet with the IRS. However, this action is what one would expect given that Thorson was acting as a legal advisor and hardly shows that Thorson was a leader. The government also neglects to inform the court that Decker was also contacted by Johnston that same day, and Johnston instructed him not to speak to the IRS. J.A. 263. Finally, to establish that he had control, the government relies on Thorson's title as a "Managing General Partner" of the Partnerships. This is unpersuasive because Johnston, the supposed go-fer, was also listed as a Managing General Partner. J.A. 974. It is therefore unclear whether this term had any actual correspondence to degree of control. While the government's evidence does show Thorson's involvement with co-conspirators, it does not show that he recruited them or controlled their activity.

In conclusion, the district court failed to carry out the "primary goal of § 3B1.1," which is "the determination of a defendant's culpability relative to other participants in a criminal activity 'based upon the role the defendant played in committing the offense.'" *Chambers*, 985 F.2d at 1268. The above application of the relevant guideline factors to the evidence before us makes clear that Ross and Johnston, both of whom organized the conspiracy and obtained much more compensation from it, were more culpable than Thorson. The court failed to apply the guideline factors, and this case should be remanded for resentencing. *See United States v. Brooks*, 957 F.2d 1138, 1150 (4th Cir. 1992) (remanding the case because a sentencing adjustment was not supported by evidence relied on by the district court).

### III.

The district court also clearly erred in finding that Thorson attempted to obstruct justice. Under § 3C1.1 of the guidelines, a defendant's base level is increased by two levels if

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1. Included in the list of examples of conduct coming within the guideline is "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." *Id.*, cmt. n.4(c).

To the district court, Thorson argued that the evidence did not support the conclusion that he engaged in obstruction of justice. J.A. 1000. While Thorson asserted that imposing the obstruction of justice enhancement and the sophisticated concealment enhancement constituted impermissible double-counting, an argument he declined to press before this Court, he also argued that "produc[ing] the alleged false documents to the Government, either during the IRS audit or in response to grand jury subpoenas," was insufficient for the obstruction enhancement. J.A. 1001. According to his reasoning, "[o]nce the documents were created, there was no choice but to produce them to the Government when the Government asked for them. Indeed, withholding the documents in response to a grand jury subpoena that specifically required that they be produced arguably would have been an act of obstruction of justice." J.A. 1001.

The court rejected Thorson's double-counting argument and concluded "for the reasons set forth in the [PSR] at Para-

graph 60" that the adjustment for obstruction of justice is appropriate." J.A. 1096. Paragraph sixty of the PSR provides that, according to the government,

> [Thorson] caused fraudulent documents to be provided to the grand jury in April 2001. [Thorson] caused to be produced to the grand jury two agreements between VCDC and HMPA 1995-2 and HMPA 1995-3, respectively, dated December 23, 1995 and December 22, 1996. . . . [T]he agreements were back-dated and submitted to support the false deductions. [Thorson] also caused to be produced pursuant to a subpoena to AGH, a Quickbooks schedule purporting to show that transfers from the Wachovia account to the AGH account were loans from MAMMA, and that [Thorson]'s use of the funds were loans from AGH. In fact, evidence demonstrated that those payments constituted income to [Thorson] from the sales of the HMPA and related partnership interests. Finally, [Thorson] caused to be provided to the grand jury the correspondence between [Thorson] and AGH to foster the false pretense that his use of the funds in the AGH account were non-taxable loans.

J.A. 1193. Thus, the court ruled that based solely on the handing over of the back-dated and false documents in response to the subpoenas, Thorson attempted to obstruct justice.

"In order to have acted willfully within the meaning of [§ 3C1.1], a defendant must 'consciously act with the purpose of obstructing justice.'" *United States v. Romulus*, 949 F.2d 713, 717 (4th Cir. 1991) (quoting *United States v. Stroud*, 893 F.2d 504, 507 (2d Cir. 1990) (emphasis omitted)). "If the defendant lacks knowledge that his actions are likely to affect a judicial proceeding, he lacks the requisite intent to obstruct." *United States v. Furkin*, 119 F.3d 1276, 1282 (7th Cir. 1997).

In this case, Thorson did not willfully obstruct or attempt to obstruct justice. The district court did *not* find that Thorson created the documents at issue for the purpose of obstructing an investigation, despite the government's direct statement to this Court that it did so.[4] Instead, the district court relied only on paragraph sixty of the PSR and concluded that Thorson "caused fraudulent documents to be provided to the grand jury." J.A. 1096. "Caused to be provided" is not the same as "created for the purpose of." Absent any evidence that Thorson created the documents to obstruct justice, simply complying with the subpoenas is insufficient to support an enhancement in this case.

Both parties agree that when the grand jury issued the subpoenas, the documents at issue had already been created. At the time of the documents' creation, without knowledge that a grand jury would even be convened, Thorson did not intend to obstruct its investigation. *See Furkin*, 119 F.3d at 1282. Thus, "the natural result of his plan" was not "to interfere with judicial processes." *United States v. Neiswender*, 590 F.2d 1269, 1274 (4th Cir. 1979). Indeed, the government argued at

---

[4]The government's brief states: "as the district court found, the defendant in this case created these documents for the purpose of obstructing any subsequent investigations." Resp. Br. at 43 (citing to J.A. 1186). The court did not make this finding. The citation to J.A. 1186 is to paragraph thirty-three of the PSR, within a section entitled "The IRS Audit," which provides that an agreement was provided to an IRS agent to obstruct the civil audit. There is no mention of a grand jury investigation. Moreover, the district court not once referred to this section of the PSR. The government has repeatedly made such misleading statements to this Court in this case.

The government also cites cases in which defendants set into motion plans to obstruct investigations before they begin, thus warranting adjustments for obstruction of justice. These cases simply are not relevant without a showing that Thorson had such a plan. The falsification of documents before any investigation took place, which was necessary to carry out the scheme of which Thorson was convicted in the first place, does not evidence a plan to thwart a future investigation. Thorson cooperated with the grand jury investigation at issue.

sentencing that the creation of the documents served a purpose apart from obstruction of justice: to conceal the offense. The government urged, and the district court agreed, that the exact same documents used to justify the obstruction enhancement were created for the purpose of concealing the true donation dates and fostering the false pretense that the payments to Thorson were loans. J.A. 1028, 1192. Thorson thus created the documents to carry out and conceal the conspiracy, not to obstruct a future grand jury investigation.

Indeed, Thorson aided the grand jury investigation by complying with the subpoenas and in no way tried to thwart the grand jury's efforts. The documents produced by Thorson provided much of the substantive ammunition in the government's case against him. Also, had Thorson not complied with the subpoenas, he would have likely been subject to obstruction of justice. Although the subpoenas at issue are not in the record, I assume that one was sent to Thorson in his representative capacity, the other being sent to AGH.[5] As such, Thorson was obligated to produce the existing business records, having no Fifth Amendment right despite the documents' incriminating nature. *See S.E.C. v. Dunlap*, 253 F.3d 768, 775 (4th Cir. 2001) (finding that the Fifth Amendment does not apply to a custodian's production of voluntarily prepared business records); *United States v. Stone*, 976 F.2d 909, 912 (4th Cir. 1992) ("The privilege against compulsory self-incrimination is, of course, personal, and does not apply to collective entities, such as corporations."). One cannot simultaneously comply with and obstruct the same investigation. In other words, it cannot be that a defendant is subject to obstruction for refusing to provide subpoenaed documents *and* for, without more, producing the same existing documents.

---

[5]The government does not dispute that Thorson would have been subject to obstruction of justice had he not complied with the subpoenas.

The government's advancement of such position, adopted by the district court and now the majority, suggests that the only way Thorson could have avoided an obstruction enhancement was to alert the government about the nature of the documents, in other words to incriminate himself. This punishes Thorson for exercising his Fifth Amendment right — yet, a defendant cannot be compelled to provide incriminating testimony. Application Note Two to § 3C1.1 provides that

> [t]his provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision.

U.S.S.G. § 3C1.1, cmt. n.2; *United States v. Taylor*, 31 F.3d 459, 468 (7th Cir. 1994) ("§ 3C1.1 cannot be read to abrogate a defendant's Fifth Amendment rights."). Thorson did not volunteer the documents or designate them for any purpose; instead, he produced the documents solely because the subpoenas required it. He did so without testimony or commentary, as was his right.

We addressed the catch-22 Thorson faced in *United States v. Coleman*, 1989 WL 50286 (4th Cir. 1989) (unpublished). In *Coleman*, the defendant back-dated certain documents and placed them in a personnel file to give the impression that the defendant's actions were lawful. *Id.* at *2. When the government subsequently subpoenaed the file, the defendant produced the file without making any alteration to it. *Id.* at *3. As the Court found, the file tampering for which the defendant was convicted had already been completed. *Id.* Yet, the government argued that the defendant should also be convicted for obstruction of a grand jury investigation. We rejected this argument on the grounds that the simple act of

producing documents requested by a subpoena could not, without more, support a conviction for obstruction of justice:

> Were we today to sanction such an approach, the result would be to discourage litigants from tendering subpoenaed documents and would naturally cause a chilling effect on the swift and complete compliance with grand jury subpoenas. We do not believe that in pursuing this conviction the government intended such a result. Nor would such a result be proper.[6]
>
> . . . Here, appellant did little more than comply with the subpoena. Any act of illegality on the part of the appellant had long been completed. We are reluctant now to affirm a conviction absent a showing of a distinct culpable act on the part of the defendant.

*Id.* Although *Coleman* involved the statutory crime of obstruction of justice, its holding is unambiguous — a defendant may not be punished for compliance with a subpoena by producing the requested documents that may have been previously altered. Thorson, like Coleman, did not alter the documents requested, but only produced the documents, as required. To sustain the obstruction adjustment here, we need a distinct culpable act by Thorson apart from his compliance with the subpoena — the government has failed to point to it.

Based on the above reasoning, I find that although commentary to the guideline does list producing a false record to the grand jury as an example of obstruction, "production" cannot mean simply providing pre-existing documents pursuant to a subpoena. A review of case law shows no case in which a defendant's offense level was raised based exclusively on

---

[6]The Court found that such result would be "especially" improper given that the custodian could not avoid production by invoking the Fifth Amendment.

the defendant providing previously-altered documents pursuant to a subpoena. For example, in *Furkin*, the only case cited by the district court and the case relied on by the government in its sentencing memorandum, the conduct upon which the Seventh Circuit affirmed the obstruction of justice enhancement was affirmative, deliberate, and undertaken with the plain purpose to obstruct the administration of justice. In that case,

> Furkin committed eight of the nine types of listed conduct that qualify for the obstruction of justice enhancement. For example, after Furkin learned of the grand jury investigation, he lied to the IRS and caused others to do so, he caused others to lie to the grand jury, he failed to produce records which had been subpoenaed, and he created false documents to be turned over to the IRS and to the grand jury.

*Furkin*, 119 F.3d at 1285; *see also United States v. Hughes*, 401 F.3d 540, 558 (4th Cir. 2005) (affirming the obstruction of justice adjustment based on perjury before a bankruptcy court); *United States v. Martin*, 369 F.3d 1046, 1061 (8th Cir. 2004) (finding that concealing and destroying documents, as well as backdating checks, after an investigation had begun, qualified as obstruction of justice).

Before this Court, the government for the first time argues that the court's application of the obstruction of justice enhancement is justified because the documents were produced *during the IRS audit*. The government did not present this argument to the district court, and the court never considered it. Thus, I believe that the majority should have adhered to "[t]he general rule . . . that except in exceptional circumstances, 'a federal court does not consider an issue not passed upon below.'" *United States v. Moss*, 963 F.2d 673, 676 (4th Cir. 1992) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). Nevertheless, I find the government's argument unpersuasive on this point.

The government relies on *United States v. Fiore*, 381 F.3d 89 (2d Cir. 2004), for the proposition that "the obstruction enhancement applies to efforts to obstruct not just criminal investigations, but also civil and administrative inquiries into the same conduct." Resp. Br. at 35. In *Fiore*, the defendant was convicted of securities fraud, as well as perjury for lying to SEC officials during their civil investigation. 381 F.3d at 91. Thus, the Second Circuit found that "[w]here federal administrative and prosecutorial jurisdiction overlap, subsequent criminal investigations are often inseparable from prior civil investigations, and perjury in the prior proceeding necessarily obstructs—if successful, by preventing—the subsequent investigation." *Id.* at 94.

Yet, in the case before us, there is no evidence that Thorson made false statements to the IRS agents or created false documents to be produced to the IRS for the purpose of obstructing the civil audit. The official civil inquiry began in March 1998 when a revenue agent initiated a civil examination for the first fraudulent partnership. The government claims that "[t]he partnership's accountant provided to the revenue agent a contract for the partnership to purchase sites that was dated December 23, 1995." Resp. Br. at 37. The government then cites to a section of the PSR claiming that "the district court found that the agreement was 'fabricated,' . . . and 'provided to the agent to establish falsely that the sites were purchased by the partnership in December 1995 to obstruct the civil audit.'" Resp. Br. at 37. While the court adopted the factual findings of the PSR in general, the court never cited to this section nor used it to justify the obstruction enhancement. The court relied solely on the grand jury investigation to support the adjustment. Moreover, the government cites no evidence that this backdated contract dated December 23, 1995, was drafted *following* the commencement of the audit.

Additionally, the government misleadingly argues now that defendants prepared correspondence during the audit "to foster the false pretense that his use of the funds in the AGH

account were non-taxable loans." Resp. Br. at 38. However, the correspondence the government cites was not produced to the IRS during the audit, but was instead produced in response to subsequent grand jury subpoenas. J.A. 1034. Accordingly, the government's argument fails on all accounts. Thus, I believe that the district court erred in adjusting Thorson's sentence for obstruction of justice.

## IV.

Because the district court clearly erred in finding that Thorson was a leader or an organizer and that Thorson obstructed justice, I would vacate his sentence and remand for resentencing.[7] Thus, I respectfully dissent.

---

[7]I would not reach Thorson's third issue on appeal — whether the sentence imposed was procedurally unreasonable.